**In re ORIENT RIVER INVESTMENTS, INC., Debtor.**

**ORIENT RIVER INVESTMENTS d/b/a New York City Shoes, Plaintiff,**

**v.**

**EQUIBANK d/b/a Liberty Bank, Defendant.**

**Bankruptcy No. 89–12206S.**
**Adv. No. 89–0697S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 16, 1989.

Steven B. Mirow, Philadelphia, Pa., for debtor.

Walter Weir, Jr., Susan M. Verbonitz, Klehr Harrison, Philadelphia, Pa., for defendant.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

A. INTRODUCTION

The instant proceeding presents the issue of a bank's right to setoff against a depositor-debtor, an issue which we considered in a case which, coincidentally, was a predecessor to this case, *In re New York City Shoes, Inc.*, 78 B.R. 426 (Bankr.E.D.Pa. 1987) (hereinafter cited as *"NYC Shoes"*). For several reasons, we conclude that the Bank's claim of a setoff here is weaker than that of the bank in *NYC Shoes* or the non-debtor tenant in a subsequent opinion of ours concerning setoff, *In re TM Carlton House Partners, Ltd.*, 93 B.R. 859 (Bankr.E.D.Pa.1988) (hereinafter cited as *"Carlton"*). Therefore, we will order the Bank to release all of the sums which the somewhat fragmented instant record indicates that it is holding in the Debtor's account on deposit with it. However, because we are not convinced that the consequential damages sought by the Debtor were proximately caused by the Bank's action or proven with the requisite certainty, we shall deny all claims by the Debtor for sums in excess of the amounts on deposit in these accounts except for pre-judgment interest on these amounts since June 26, 1989, and the Debtor's claim for reasonable attorney's fees pursuant to 11 U.S.C. § 362(h).

B. PROCEDURAL HISTORY

On February 1, 1988, this court approved the sale of most of the assets of the ill-fated debtor in *NYC Shoes* to the instant Debtor, ORIENT RIVER INVESTMENTS, INC. (herein referred to as "the Debtor").[1] We did this somewhat reluctantly, due to our reservations about the instant Debtor's financial stability. At the time of the sale, the *NYC Shoes* debtor's chain of discount women's shoe stores had shrunken from a high water mark of over fifty (50) stores to about twenty-five (25) stores. Although the Debtor had the advantage of ownership linked to Taiwanese shoe manufacturers, it nevertheless was compelled to follow the course of its predecessor and file a voluntary Chapter 11 bankruptcy petition of its own on June 15, 1989.

On June 22, 1989, just as the undersigned was preparing to leave on an extended vacation, the Debtor and its largest secured creditor, Maurice L. Rothschild & Co. (hereinafter referred to as "Rothschild"), both made filings relevant to a dispute over the Debtor's use of Rothschild's cash collateral. In our absence, the matter was handled by Chief Judge Thomas M. Twardowski, and resolved by a consent Order of Chief Judge Twardowski of July 13, 1989. In the midst of the disputes with Rothschild, the Debtor apparently brought to Chief Judge Twardowski's attention the fact that the Defendant herein, EQUIBANK d/b/a LIBERTY BANK (herein referred to as "the Bank"), had frozen the Debtor's accounts with it because it had received a pre-petition attachment order pursuant to a judgment obtained against the Debtor by McKnight–Siebert Shopping Center, Inc. (hereinafter "McKnight"). After a conference call involving Chief Judge Twardowski, the Debtor's counsel, and a Bank representative on June 26, 1989, the Debtor was under the impression that the funds in the accounts would be released. However, when release of funds did not transpire, another conference call of June 30, 1989, on this same subject was conducted by Chief Judge Twardowski, in which the Bank participated by counsel. At that time, counsel advised that the Bank would not release the Debtor's funds in the accounts because, in an arbitration proceeding of some unspecified date, the Bank had

---

1. Our most detailed chronicle of the difficulties of the *NYC Shoes* debtor are set forth in *In re New York City Shoes,* 84 B.R. 947 (Bankr.E.D. Pa.1988).

lost a case brought against it by Volpe Importing Co. (hereinafter "Volpe") in the amount of approximately $17,100 in connection with the Bank's efforts to refuse payment of part of a cashier's check issued to Volpe on the Debtor's behalf.

On July 26, 1989, the Debtor commenced the instant adversary proceeding by filing a Complaint including the following three Counts: (1) a request for turnover of all sums held by the Bank in the Debtor's accounts; (2) a claim for lost profits occasioned by the Bank's refusal to immediately turn over the funds in the accounts on or about June 26, 1989; and (3) a contention that the Bank had violated the automatic stay, rendering it liable to the Debtor for damages under 11 U.S.C. § 362(h).

No expedited disposition of this proceeding was sought. It was listed for trial on September 13, 1989. The Bank filed an Answer on August 28, 1989. On practically the eve of trial, September 11, 1989, the Bank filed a motion for leave to file an interpleader and third-party complaint to join Volpe, and dismissal and/or a stay of proceedings in the interim. Both the Debtor and Volpe, the latter of whom appeared on September 13, 1989, and contended that its claims against the Bank involved more than the issue of the Debtor's check, opposed this motion. We orally denied the motion due to its untimely filing and our belief that this matter did not appear to cast the Bank as a stakeholder, but as a potential wrongdoer as to both the Debtor and Volpe as to matters which, at least in part, did not involve them both.[2] While the Debtor was prepared to try the proceeding that day, the number of other matters on our list requiring trials on that day rendered it impossible to reach this matter. We also believed that at least a short delay after denial of its interpleader motion would provide the Bank with some time to prepare for trial on the Complaint as pleaded. We therefore continued the trial until September 18, 1989.

However, at the trial on September 18, 1989, only the Debtor called any witnesses. Testifying were Julie Chen, the Debtor's Controller, and Wayne Van Curen, the Debtor's buyer. At the close of the testimony, we ordered the parties to submit Proposed Findings of Fact and Proposed Conclusions of Law on or before September 22, 1989 (the Debtor), and September 29, 1989 (the Bank).

On September 29, 1989, the docket reflects that the Bank filed an answer to a post-trial motion of the Debtor to strike the Bank's pleadings asserting a setoff, because the Bank had not obtained relief from the automatic stay before asserting same. However, the docket does not reflect that any such motion was ever filed by the Debtor. Assuming that such a motion has been filed, it would be rendered moot due to our disposition of this proceeding.

Despite the rather skimpy factual record made, we are obliged to render our decision in the form of Findings of Fact and Conclusions of Law pursuant to the dictates of Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a). We shall do so, setting forth each Conclusion of Law as a headnote to a discussion of the pertinent legal principles, where necessary.

## C. FINDINGS OF FACT

1. On March 1, 1988, the Debtor issued a check, postdated to March 8, 1988, in the amount of $42,000.00 to Volpe in payment for a shipment of shoes.

2. On March 4, 1988, the Debtor placed a stop payment order on the check. The stop payment order was delivered to the Bank on March 18, 1988.

3. The stop payment order included a provision by which the Debtor agreed to hold the Bank harmless for any liability incurred by the Bank in refusing payment of that check.

---

**2.** As it developed, our instincts here were correct, because the Debtor has established that the Bank is retaining deposits far in excess of the $17,100 sum for which it may be liable to Volpe. Thus, part of the Debtor's claims pertain to sums concerning which Volpe has no claim. In such circumstances, an interpleader action appears inappropriate. *See Gaines v. Sunray Oil Co.,* 539 F.2d 1136, 1141-42 (8th Cir.1976).

4. Volpe presented the check to the Bank on March 17, 1988. Despite the Debtor's stop payment order, the Bank issued its cashier's check in the amount of $42,000.00 to Volpe in payment of the check.[3]

5. The Bank then stopped payment on its cashier's check. As a result of this action, Volpe instituted an action (in what court is not clear) against the Bank. This resulted in an arbitration award on some undesignated date in favor of Volpe, in the amount of $17,107.20, the balance of the $42,000 apparently not subsequently paid to Volpe by the Debtor. This award has apparently been appealed by the Bank.

6. Thereafter, McKnight, on June 24, 1989, attached the funds in the Debtor's accounts at the Bank pursuant to a Writ of Execution and Attachment on a judgment. However, Ms. Chen testified, without rebuttal, that this Attachment has been lifted and it is no longer a factor influencing the Bank's refusal to release funds to the Debtor.

7. Ms. Chen testified, again without rebuttal, that, on the day before the filing of its petition, the Debtor's operating, payroll, and retail store accounts at Equibank contained the following respective balances: $32,223.63; $222.05; and $1,023.47, or a total of $33,469.15. She further testified that charges totalling $4,837.29 were entered against the accounts, which are apparently indisputably justified, leaving a net balance of $28,631.66.[4]

8. Finally, Ms. Chen testified, again without rebuttal, that $7,188.24 was deposited into the retail store account on the Debtor's behalf post-petition. Therefore, per her undisputed testimony, the total balance in the Debtor's accounts with the Bank is $35,820.10.

9. Mr. Van Curen testified, had the Bank not frozen the funds on deposit in the Debtor's accounts with it, the proceeds of the accounts could have been used by the Debtor to purchase inventory which would have served as a basis for $700,000.00 worth of additional sales. Mr. Van Curen's estimation was based on his assumption that he could have brought 20,000 pairs of shoes at a cost of $5.00 per pair, resulting in sales (after markdowns) of approximately $296,000.00 over a six-week period.

10. Mr. Van Curen's calculations fail to take into consideration the fact that the summer months, during which time the deposits were withheld, are the Debtor's lowest period; that the Debtor plans to close at least five of its stores; and that the market may not demand the supply upon which Mr. Van Curen based his calculations. In addition, Mr. Van Curen admitted on cross examination that he has no knowledge of the revenues or operating costs of the Debtor upon which a profit margin could be calculated.

11. Mr. Van Curen's estimation as to the amount of net sales that could have been derived by utilizing the funds maintained in the accounts at the Bank does not take into account the Debtor's operating costs and the demand, or lack thereof, of the market. Also, he testified that eighty (80%) percent of the Debtor's inventory comes from its related manufacturers in Taiwan and that, with respect to some of its vendors, it has re-established credit relations. Therefore, the impact of an influx of additional cash available to the Debtor is uncertain.

12. At the close of testimony, the court suggested that the Bank should immediately release to the Debtor all sums in excess of the $17,107.20 which it purportedly held as a setoff in its accounts. The Bank's counsel resisted that suggestion unless the Debtor would agree to withdraw any claim to recover the $17,107.20 as well. This was apparently the Bank's position throughout the duration of this controversy.

---

3. It is not clear why the Bank issued a cashier's check instead of simply paying the Debtor's check.

4. In its post-trial submissions, the Bank contends that "an automatic balance transfer was issued from the operating account in the amount of $5,245.48," which should also be deducted therefrom. However, there was no evidence of this "transfer" in the record made at trial, and we may therefore not consider it.

### D. CONCLUSIONS OF LAW/DISCUSSION

1. *As this is a proceeding seeking the turnover of the contents of a distinct sum which is property of the estate and relief for an alleged violation of the automatic stay, it is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (b)(2)(E), (b)(2)(G), (b)(2)(K), and (b)(2)(O), which we must hear and determine pursuant to 28 U.S.C. § 157(b)(1). See In re B. Cohen & Sons Caterers, Inc., 97 B.R. 808, 813 (Bankr.E.D.Pa.1989); and Carlton, supra, 93 B.R. at 872.*

2. *The Bank has no conceivable right to setoff as to the post-petition deposits made by the Debtor.*

The principle defense of the Bank to the Debtor's claims in this proceeding is that it is entitled to set off its claims against the Debtor by freezing the Debtor's deposits with it. These deposits do indeed constitute a debt of the Debtor to the Bank. *See, e.g., In re Empire Flooring Co.,* 43 F.2d 748, 749 (W.D.Pa.1930). However, the Bank's right of setoff is circumscribed by 11 U.S.C. § 553(a), which provides as follows:

§ 553. Setoff

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

It is well-established that § 553(a) sets the outer limits of a creditor's "narrow scope of right to setoff," which may be further limited by the "fundamental principle of bankruptcy law that distribution among creditors must be equal." *Carlton, supra,* 93 B.R. at 867. *See also In re Lessig Construction, Inc.,* 67 B.R. 436, 440–42 (Bankr.E.D.Pa.1986). Further, the exercise of setoff rights, particularly by a bank which is the depository of a debtor's funds, "cannot frustrate the reorganization process" by preventing a debtor from obtaining access to his only cash. *NYC Shoes, supra,* 78 B.R. at 431. *See also In re Penn Central Transportation Co.,* 453 F.2d 520, 523 (3d Cir.1972).

■ In no event can a creditor seek to assert setoff as to a claim which the debtor has against it which has arisen post-petition. *See Cooper–Jarrett, Inc. v. Central Transport, Inc.,* 726 F.2d 93, 96 (3d Cir. 1984); *Carlton, supra,* 93 B.R. at 867; *NYC Shoes,* 78 B.R. at 432; and *Lessig, supra,* 67 B.R. at 442–43. The deposits made into the Debtor's retail store account with the Bank after its bankruptcy filing are a claim of the Debtor against the Bank which only arises post-petition. Therefore, the Bank has absolutely no right to retain the Debtor's post-petition deposits, which Ms. Chen testified without rebuttal amounted to $7,188.24. This sum must, then, be turned over to the Debtor immediately by the Bank. In light of the clear precedent in *NYC Shoes,* this action, as we note at pages 796–97 *infra,* merits invocation of 11 U.S.C. § 362(h).

3. *The Bank also has no right of setoff as to amounts deposited by it pre-petition which are in excess of the Bank's pre-petition claims against the Debtor.*

■ Likewise, it is equally clear that the Bank has no right to refuse to turn over the *entire* contents of an account containing, on the basis of this record, $28,631.66 in pre-petition deposits or indebtedness to the Debtor because it contends that it is entitled to set off a claim of $17,107.20 against the Debtor's deposit. *Compare NYC Shoes,* 78 B.R. at 432–33. Therefore, there is no doubt that the additional difference of $11,524.46 between the amount which is sought to be set off and the sum of the Debtor's deposits must be turned over to the Debtor forthwith. The Bank's retention of the sums of $7,188.24 in post-petition indebtedness and $11,524.46 over and above any conceivable setoff, or a total of $18,712.70 of which it has no right whatsoever, undermines the credibility of the Bank's position on any of the points which

it raises and exposes it to liability under 11 U.S.C. § 362(h). *See* pages 796–97 *infra.*

4. *Under the facts of this case, we shall not allow the Bank to set off even the sum of $17,107.20 as to which it arguably has a pre-petition claim against the Debtor.*

■ The Bank has at least a respectable contention that it is entitled to set off the $17,107.20 sum which Volpe was awarded against it in arbitration against its debt to the Debtor. The Bank argues that, by the force of 13 Pa.C.S. § 4407(2), it is subrogated to any rights that the payee of the check in issue (Volpe) has against the drawer or maker (the Debtor) for payments made over a stop-payment order. It next argues that, if this right to subrogation can indeed be set off against the Debtor's claim against the Bank arising out of its pre-petition deposits, the Bank would not be obliged to turn over to the Debtor the sum of the setoff allowed by effect of 11 U.S.C. § 542(b).

However, there are several chinks in the Bank's argument. Firstly, this is *not* a conventional bank setoff situation, where a bank freezes a deposit of a customer who also owes a definite obligation to it, most commonly an outstanding loan. *Compare Cusanno v. Fidelity Bank*, 29 B.R. 810, 811 (E.D.Pa.1983); *Empire Flooring*, 43 F.2d at 749; *NYC Shoes, supra*, 78 B.R. at 427, and *In re Cabrillo*, 101 B.R. 443, 447–48 (Bankr.E.D.Pa.1989). Rather, here, the Debtor has made no loan from the Bank and the Bank's claim is based solely upon subrogation rights which are contingent upon Volpe's establishing the validity of its claim against the Bank after an appeal from an arbitration award of $17,-107.20 in favor of Volpe. Our decision in *NYC Shoes* that the bank there had any rights to freeze the debtor's account was ultimately dependent solely on our finding that the funds in the Debtor's account were the bank's cash collateral. 78 B.R. at 429–32. Here, it is far from clear that the Bank has any security interest in the sums on deposit with it and hence it may be argued that no rights to freeze the deposits on the basis of 11 U.S.C. § 363(c) exists.

Secondly, the rights of the Bank against the Debtor under 13 Pa.C.S. § 4407(2) are not crystal clear. Volpe's claim is apparently based upon *the Bank's* stop payment order on its *own* cashier's check. The particular item giving rise to the Bank's liability to Volpe is therefore *not* the original check drawn by the Debtor. This sequence of circumstances may foreclose the Bank's claims to subrogation under 13 Pa.C.S. § 4407(2).

Thirdly, it is not totally clear whether the Bank's potential subrogation claim against the Debtor should be classified as a pre-petition claim or a post-petition claim. It is well-established, at least in this Circuit, that an indemnity claim which arises due to post-petition developments is not a pre-petition claim. *In re M. Frenville Co.*, 744 F.2d 332, 336–37 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). It appears that the claim of the Bank against the Debtor arose (or will arise) only when Volpe obtains a final judgment against the Bank. It is not clear on this record whether even the arbitration award in favor of Volpe occurred pre-petition. It is far from clear that such an award is a judgment, or is a sufficiently final determination in any sense, such as would trigger a claim of the Bank against the Debtor under 13 Pa.C.S. § 4407(2). If the Bank's claim against the Debtor is a post-petition claim, it is not a claim allowable in this bankruptcy case at all, *see* 11 U.S.C. § 502(b), and, by the terms of § 553(a), requiring that the obligations which are to be set off against each other both be pre-petition, not allowable under § 553(a).

All of the foregoing considerations are relevant to the issue of whether the indebtedness of the Bank to the Debtor and the potential liability of the Debtor to the Bank are indeed mutual obligations. An absence of mutuality between the original claim and the claim which is attempted to be set off against the original claim precludes the successful invocation of setoff. *See In re Windsor Communications Group, Inc.*, 79 B.R. 210, 215–16 (Bankr.E.D.Pa.1987); and *Marta Group, Inc. v. County Appli-*

*ance Co.,* 79 B.R. 200, 204 (Bankr.E.D.Pa. 1987). Whether a contingent claim which may ultimately dissolve in the course of pending litigation could ever be considered mutual to a debtor's claim to what is often a debtor-in-possession's most needed asset, *i.e.,* cash from its bank accounts, is a point to ponder.

However, we need not ponder the point here. While we are inclined to follow the reasoning of *Carlton, supra,* 93 B.R. at 870, that the Bank's assertion of a right to setoff in litigation in bankruptcy court without first obtaining relief from the automatic stay is not itself violative of the stay,[5] we are inclined to exercise our control of the Bank's right to assert setoff here in a different fashion than we did in *Carlton.* Considering the four weaknesses in the Bank's claim of setoff set forth in the foregoing four paragraphs and considering the need of the Debtor to gain access to its cash, *see Penn Central, supra,* 453 F.2d at 523; and *NYC Shoes, supra,* 78 B.R. at 431, we decline to allow the Bank to assert a setoff to the claims of the Debtor here.

The Bank's claim of a setoff regarding the $17,107.20 sum for which it may ultimately be liable to Volpe will thus be rejected. The Bank is therefore obliged to turn over to the Debtor what the instant record indicates is the entire sum of outstanding deposits in the Debtor's accounts, *i.e.,* the sum of $35,820.10.

5. *The Debtor's claims for consequential damages must be rejected on the grounds that the Debtor has failed to establish, to our satisfaction, that the losses claimed were proximately caused by the Bank's actions and hence that such damages were reasonably foreseeable.*

█ In order to render the Bank liable to it for consequential damages resulting from the Bank's failure to return the funds in issue, the Debtor was obliged to prove that the Bank's conduct proximately

caused the damages claimed, *In re Repco Products Corp.,* 100 B.R. 184, 194–95 (Bankr.E.D.Pa.1989), *aff'd,* C.A. No. 89–5514 (E.D.Pa. Sept. 8, 1989), and that these damages were a reasonably foreseeable result of the Bank's actions. *Id.* at 198–201. We observe that the Debtor's claims are those of lost profits of a new business which has been less than dramatically successful during its short tenure. A new business's claims for lost profits are generally too speculative to be allowed as an element of damages. *See In re Jackson,* 92 B.R. 987, 993–94 (Bankr.E.D.Pa.1988); and *Exton Drive–In, Inc. v. Home Indemnity Co.,* 436 Pa. 480, 261 A.2d 319 (1969).

Furthermore, as we pointed out in Findings of Fact 10 and 11, page 793 *supra,* the only evidence of these elements of damage, the testimony of Mr. Van Curen, fails to take many significant issues into account. We therefore cannot say, with the requisite "reasonable certainty," that the testimony of Mr. Van Curen supports the Debtor's damage claims. *See In re Windsor Communications Group, Inc.,* 80 B.R. 712, 727–28 (Bankr.E.D.Pa.1987), *aff'd in part & rev'd in part,* 96 B.R. 495 (E.D.Pa.1989); and *In re Chapman,* 77 B.R. 1, 6–7 (Bankr. E.D.Pa.1987). We note that, even in its post-trial submissions, the Debtor is unable to quantify these demands.

We cannot conclude that such speculative elements of damages should have been considered by the Bank to be a reasonably foreseeable consequence of its actions. Finally, we believe that the Debtor's counsel would not have hesitated to seek an expedited disposition of this controversy if the Bank's actions were indeed jeopardizing its entire prospect of reorganization, as it claims in arguing the validity of these demands. The Debtor's claims for consequential damages will therefore be denied.

6. *The Debtor is entitled to interest on the funds directed to be turned over plus reasonable attorneys' fees incurred in prosecuting this action, pursuant to 11 U.S.C. § 362(h).*

---

5. As a result of this reasoning and the mootness of the point in light of the ultimate result of this proceeding, any motion of the Debtor to strike the Bank's pleading setoff without first obtaining relief from the stay need not be considered.

The Debtor alleged, in addition to claims for turnover, that the Bank's actions constituted violations of the automatic stay imposed in its favor pursuant to 11 U.S.C. § 362(a). We agree that 11 U.S.C. §§ 362(a)(3), (a)(6), and (a)(7) are implicated here. Consequently, the Debtor's contention that it is entitled to damages based upon 11 U.S.C. § 362(h), which provides as follows, must be considered:

> (h) An individual injured by any willful violation of a stay provided by this section [§ 362(a) ] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

We do not doubt that the actions of the Bank were "willful," as that term has been consistently defined in decisions of this court, since it had knowledge of the Debtor's bankruptcy filing and consciously chose to nevertheless freeze its accounts. *See, e.g., In re McLaughlin*, 96 B.R. 554, 559 (Bankr.E.D.Pa.1989), *aff'd*, C.A. Nos. 89–2279, 89–3672, 89–3748 (E.D.Pa. Sept. 18, 1989); *In re Stephen W. Grosse, P.C.*, 84 B.R. 377, 384 (Bankr.E.D.Pa.1988) (FOX, J.), *aff'd*, 96 B.R. 29 (E.D.Pa.), *aff'd*, 879 F.2d 857 (3d Cir.1989); *In re Aponte*, 82 B.R. 738, 742 (Bankr.E.D.Pa.1988) (TWARDOWSKI, CH. J.); and *In re Wagner*, 74 B.R. 898, 904 (Bankr.E.D.Pa.1987) (FOX, J.).

We have already considered the issue of the Debtor's actual damages in Conclusions of Law 4 and 5, pages 795–96 *supra*. The Debtor's damages certainly must include the sum of $35,820.10 which the Bank has wrongfully withheld. Since the Bank should have immediately turned over these funds to the Debtor when the Debtor made demand for same on June 26, 1989, we shall award the Debtor pre-judgment interest on this sum, measured by the rate set forth in 28 U.S.C. § 1961(a), as in *Windsor Communications, supra*, 79 B.R. at 217–18, from that date forward.

In addition, the Debtor is entitled to reasonable attorneys' fees and costs expended by its counsel in prosecuting this action. It is clear that this legal action was necessary for the Debtor to recover its funds due to the intransigence of the Bank. *Compare McLaughlin*, 96 B.R. at 560–62. We shall therefore allow the Debtor's counsel to submit an Application requesting reasonable attorneys' fees and costs if counsel are unable to resolve this issue amicably. *See id.* at 563.

We have carefully considered whether an additional award of punitive damages to the Debtor from the Bank would be appropriate. *Compare B. Cohen & Sons, supra*, 97 B.R. at 817–18. Particularly disturbing to us was the Bank's retention of the $18,712.70 sum to which it had no *conceivable* rights, *see* Conclusions of Law 2 and 3, pages 794–95 *supra*, especially in light of our decision in *NYC Shoes*, 78 B.R. at 432–33. *Accord, e.g., In re Morrell*, 880 F.2d 855, 856 (5th Cir.1989). Also distressing was the Bank's insistence that it retain all of these funds unless the Debtor dropped its other claims, the latter of which we ultimately vindicated as well. This was, in our view, oppressive conduct on the part of the Bank which could have justified punitive damages.

However, no additional award will be made here, for several reasons. First, we have some doubts as to whether the Debtor's accounts actually contain the $35,820.10 which we shall award to it. Although Ms. Chen's testimony was unrebutted, and we therefore have nothing of record which would cause us to question it, we found Ms. Chen to be a tentative and uncertain witness whose reliability, though not her intention to tell the truth, was questionable. If in fact the Bank was holding deposits of less than $35,820.10, an award of this amount would include punitive damages. We have also refused to accept the Bank's respectable claim of a right to set off the $17,107.20 sum. Finally, we are awarding interest, attorneys' fees, and costs to the Debtor's counsel. The Bank's conduct is not so aggravated as that of the creditor in *B. Cohen & Sons, supra*, which literally destroyed all of the debtor's beautiful and apparently unreplaceable personal property. Additional monetary damages therefore do not seem

appropriate. We thus conclude that the award which we shall make is sufficient.

## E. CONCLUSION

An Order consistent with this conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 16th day of October, 1989, after the trial of the above-entitled proceeding on September 18, 1989, and upon consideration of the post-trial submissions of the parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Debtor and Plaintiff, ORIENT RIVER INVESTMENTS, INC. d/b/a NEW YORK CITY SHOES, and against the Defendant, EQUIBANK d/b/a LIBERTY BANK, in the amount of $35,820.10.

2. In addition, the Debtor is entitled to pre-judgment interest on the sum of $35,820.10, in accordance with the measurement of same set forth in 28 U.S.C. § 1961(a), from June 26, 1989, to the date that the judgment is fully satisfied.

3. The Debtor is also awarded reasonable attorneys' fees and costs pursuant to 11 U.S.C. § 362(h). The parties are directed to confer to resolve the issue of attorneys' fees and costs due to the Debtor's counsel but, if they are unable to resolve this issue, and the Debtor has made a reasonable demand, the Debtor may file a motion requesting reasonable attorneys' fees and costs, including compensation on the fee application, if such is necessary, same to be filed within thirty (30) days of the date of this Order, in procedural conformity with *In re Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir. 1975); and *In re Mayflower Associates,* 78 B.R. 41 (Bankr.E.D.Pa.1987).

4. Any motion filed by the Debtor to strike the Defendant's defenses to this action based upon setoff is DENIED as moot.